UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

--------------------------------------------x
IRENE ZAMD,
Plaintiff,

v. Civil Action No.

VERTEX PHARMACEUTICALS, INC.,
Defendant.
---------------------------------------------x

COMPLAINT
(Jury Trial Demanded)

Parties

1. The plaintiff, Irene Zamd, is a citizen of Massachusetts and a resident of Marlborough, Middlesex County, Massachusetts.

2. The defendant, Vertex Pharmaceuticals, Inc., is a for-profit Massachusetts corporation, with a principal place of business in Boston, Suffolk County, Massachusetts.

Jurisdiction and Venue

3. This action arises under 42 U.S.C. §12101, *et seq*.

4. Federal question jurisdiction is invoked pursuant to 28 U.S.C. §1331.

5. Venue is proper pursuant to 28 U.S.C. §1391(b), as the events giving rise to these claims occurred in the District.

6. The plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The plaintiff received a right-to-sue letter from the EEOC dated April 11, 2017.

Facts

7. In June 2010, Ms. Zamd began working as a Lead Quality Assurance Auditor/Specialist in Vertex's Quality Compliance Management ("QCM") Good Clinical Practice division. Her primary role was to perform audits of clinical trials. In December 2011, Vertex promoted Ms. Zamd to Quality Lead in her division.

8. In her role at Vertex, Ms. Zamd was responsible for carrying out Good Clinical Practice ("GCP") audits of pharmaceutical studies, vendors, processes, documents and other functions to assure compliance with internal protocols, and applicable federal and state regulations, and in foreign countries to assure and verify compliance with applicable laws and regulations

9. Prior to her employment with Vertex, Ms. Zamd had worked in the pharmaceutical field in quality assurance, conducting GCP audits, for more than twenty years.

10. During the course of her employment with Vertex, through her abrupt dismissal on May 22, 2013, Ms. Zamd performed her duties faithfully and diligently, consistently receiving among the highest performance ratings, including her 2011 and 2012 annual evaluations, which rated her as "Leading," which is the best possible rating.

11. Among the positive comments in Ms. Zamd's 2011 performance evaluation was that "Irene has exceeded expectations during regulatory inspections at the investigator sites by being on the road for a month straight to ensure inspection went well ... feedback from the sites and internally was positive about her professionalism and work ethic" and "Her colleagues and external clients enjoy working with her due to her candor and forthrightness."

12. In her last performance evaluation, which was completed in December 2012, (five months before Vertex terminated her), Ms. Zamd received the highest performance rating available. From the time of this performance review until her termination, Ms. Zamd received no criticism of her job performance.

13. From in or around 1989, Ms. Zamd has suffered from a medical condition known as Multiple Chemical Sensitivity, which causes her to be hyper sensitive to scented products. Doctors believe that her condition is the result of a five centimeter cyst above and behind her left eye that presses on the olfactory nerve. When she is exposed to most products containing fragrances, her condition causes symptoms that include severe headaches/migraines, nausea, numbness on one side of her face and neck, metallic taste, respiratory difficulties and other symptoms.

14. Ms. Zamd's condition is a physical impairment and, when she is exposed to scented products, substantially limits her major life activities including, but not limited to her ability to perform certain tasks, such as reading, processing information and concentrating.

15. When Ms. Zamd began her job at Vertex in 2010, she informed her then-supervisor, Martin Caron, Associate Director of Quality Partnership Management, of her disability.

16. In 2010, Ms. Zamd requested her colleagues to minimize or refrain from wearing scented products. Ms. Zamd's colleagues generally cooperated, and so Ms. Zamd did not experience substantial difficulties working in the Vertex office. Periodically, when her symptoms flared, she would work from home. At the time, Mr. Caron permitted his staff to work from home on occasion.

17. As part of her role in the Quality Partnership Management division, Ms. Zamd's job duties included traveling to locations where clinical trials were being conducted, typically hospitals and doctors' offices, to perform audits, which involved interviewing the health care professionals directing and conducting trials, and reviewing the records of those trials.

18. By 2013, Ms. Zamd had been conducting off-site audits for Vertex successfully for more than two years, and before that for more than twenty years as an employee of other pharmaceutical companies. In her experience, hospitals and doctor's offices usually do not permit fragrances, and therefore, working in such locations seldom exacerbated her disability. Ms. Zamd was able to make arrangements with the people with whom she had to work at these audit locations by requesting them to minimize or refrain from using fragrances that would trigger her symptoms. Similarly, when she had to attend audits at remote locations requiring air

travel, she was generally able to make arrangement with members of airline flight crews to change seats in the rare situations when she encountered fragrances that triggered her symptoms that were not somehow obviated by the constant circulation of cabin air. In events when she could not obtain such accommodations, she suffered the consequences of her disability.

19. In the summer of 2012, Vertex hired Deborah Waltz as the Senior Director of QCM. In that role, Ms. Waltz became Ms. Zamd's immediate supervisor.

20. By late 2012/early 2013, most of Ms. Zamd's original colleagues had left Vertex for one reason or another, and some of the newer employees wore scented products that exacerbated Ms. Zamd's disability. When the plaintiff requested that she do so, Ms. Waltz refused to send out a notice asking Ms. Zamd's colleagues to refrain from wearing scented products. (Ms. Zamd did personally ask her coworkers to minimize or simply not to wear scented products.)

21. Some of her coworkers complied with Ms. Zamd's request, although not always, and the presence of some or all of those scents aroused the plaintiff's symptoms, as described above.

22. In mid-February 2013, Ms. Zamd requested a reasonable accommodation for her fragrance sensitivity disability. Initially, she did so by speaking with Robert Castellucci, Vertex's Vice President of Quality, explaining her sensitivity to fragrances, the symptoms she suffered when exposed to certain scents, and she asked him to provide an accommodation. Specifically, she requested that

Vertex permit her to work remotely from home on a part-time basis, which would have minimized the cumulative effects caused by her exposure to scented products.

23. Mr. Castellucci denied her request for accommodation, despite the fact that other employees within Ms. Zamd's department who did not have disabilities had been permitted to work from home for appreciable periods of time, including one who was allowed to work from her home in Canada every other week. Mr. Castellucci did offer to send out a notice to the general employee population informing them of Ms. Zamd's sensitivity to scents, but he never did so.

24. Shortly thereafter, Ms. Zamd spoke with her immediate supervisor and manager, Ms. Waltz, who referred Ms. Zamd to Vertex's Human Resources Department (hereafter, "HR").

25. Following her conversation with Ms. Waltz, Ms. Zamd communicated with Katie Solt, in HR, verbally and via e-mail.

26. On or about February 20, 2013, Jane Martiny, in HR, requested medical documentation substantiating Ms. Zamd's disability and her need for accommodation.

27. Also on February 20, 2013, Ms. Zamd's supervisor, Deborah Waltz, emailed Katie Solt, in HR, and reported that she was concerned that Ms. Zamd's fragrance disability would prevent her from conducting audits. Ms. Solt instructed Ms. Waltz not to change any of Ms. Zamd's audit duties.

28. Ms. Waltz's alleged concern about Ms. Zamd's ability to carry out her assignments was not based on fact, and was intended to obstruct the plaintiff's

employment. Notably, Ms. Zamd's request for accommodation concerned her Vertex office environment only.

29. In her reasonable accommodation request, Ms. Zamd did not seek to limit the time she spent conducting off-site audits, nor did she seek any accommodation with respect to off-site audits, because she was exposed to scented products infrequently when performing audits.

30. Ms. Zamd submitted a letter dated March 13, 2013 from her treating physician, Michelle Goh, M.D., which described her medical condition, its etiology and symptoms. Dr. Goh requested that Ms. Zamd be permitted to work from home several days per week so that Ms. Zamd would not be continuously exposed to scented products.

31. As early as September 2010, Ms. Zamd had informed Vertex that working in a separate office would not effectively address her medical condition. Yet, in response to her request for accommodation, Vertex suggested that Ms. Zamd work out of a separate office. This proposal was not a reasonable accommodation, because it failed to address Dr. Goh's recommendation that Ms. Zamd not be continuously subjected to scents. Even with her own office, Ms. Zamd would still encounter scents on a daily basis in common areas such as hallways, restrooms, conference rooms and break rooms.

32. On April 1, 2013, three weeks after Ms. Zamd submitted her doctor's note, Ms. Waltz informed Ms. Zamd that HR had denied her request to work from

home. In this conversation, Ms. Waltz also stated that because of Vertex's inability to control Ms. Zamd's environment when working off-site, Vertex would no longer permit Ms. Zamd to perform off-site audits.

33. At the time of her conversation with Ms. Waltz, Ms. Zamd had been scheduled to perform an audit in Ireland. Ms. Waltz reassigned this audit to another employee.

34. Ms. Waltz's instruction that Ms. Zamd could no longer perform audits was irrelevant to Ms. Zamd's request for accommodation, failed to address her accommodation request, and failed to address Ms. Zamd's disability for the reasons stated above. Vertex's limitation on Ms. Zamd's assignments was intended to, and did, interfere with Ms. Zamd's employment with the company. Further, Vertex limited Ms. Zamd's assignments on the basis of an unsupported perception that Ms. Zamd's disability prevented her from performing her job duties.

35. Despite having submitted a doctor's note in support of her reasonable accommodation on March 13, 2013, by April 1, 2013, HR had not conducted an interview or consultation with Ms. Zamd regarding her reasonable accommodation request.

36. Following Ms. Waltz' instructions described in Par. 32, above, Ms. Zamd complained to HR that Ms. Waltz was discriminating against her for requesting accommodation by eliminating her audit duties. She requested a meeting with HR to discuss the matter.

37. During the first week of April 2013, Ms. Zamd met with Amanda Tramontozzi and Jane Martiny, in HR, to discuss her concerns about Ms. Waltz's actions. Ms. Tramantozzi told Ms. Zamd that despite what Ms. Waltz may have stated, Vertex HR had not yet made any determination regarding Ms. Zamd's reasonable accommodation request.

38. On or about May 9, 2013, Vertex instructed Ms. Zamd to produce an additional note from her doctor justifying her ability to travel and conduct site audits in light of her scents sensitivity.

39. Although the additional material was irrelevant to the pending request for accommodation, Ms. Zamd submitted a second note from Dr. Goh, dated May 13, 2013, which stated that she was able to travel and to conduct site audits without the need for reasonable accommodation.

40. From February through May 2013, Ms. Zamd suffered numerous symptoms including pain, dizziness, and other discomfort relating to the cumulative effect of her exposure to fragrances in the workplace including pain, dizziness, and other discomfort. At times, Ms. Zamd would work from home or take sick leave when her symptoms flared.

41. Vertex never told Ms. Zamd that she was prohibited from working from home on an ad hoc basis when her scent sensitivity symptoms flared. Similarly, Vertex never told Ms. Zamd that she needed to give Vertex twenty four (24) hours' notice to work from home.

42. At no time did Vertex request that Ms. Zamd be examined by a physician of its choosing.

43. In April and May 2013, Ms. Waltz sent numerous emails to human resources, making baseless and unsupported complaints about Ms. Zamd's behavior and performance. Ms. Zamd never received notice of alleged performance concerns.

44. Following her request for accommodation, Ms. Waltz and Ms. Zamd's colleague, Margot Holland, began bullying and harassing her. Ms. Holland was rude and condescending to Ms. Zamd, and at other times completely ignored her and refused to acknowledge her. Ms. Waltz began treating Ms. Zamd poorly and belittled her in front of colleagues. Following the April 1, 2013 meeting, Ms. Waltz stopped speaking entirely to Ms. Zamd, left her out of a presentation at a management meeting.

45. On May 20, 2013, Ms. Zamd complained to Ms. Solt that Ms. Waltz and Ms. Holland had been bullying her since she requested accommodation.

46. On May 20, 2013, three months after requesting accommodation, Vertex verbally informed Ms. Zamd that her request for accommodation had been granted, that she would be permitted to work from home three assigned days per week, and would be provided with a separate office space for the two days per week that she worked in Vertex's office.

47. Human resources instructed that Ms. Waltz meet with Ms. Zamd on May 22, 2013 about implementing the accommodation. Because Ms. Waltz was

wearing a strong scent that triggered Ms. Zamd's symptoms that day, Ms. Zamd asked if they could meet outside on the Vertex patio.

48. Ms. Waltz refused to meet with Ms. Zamd outside.

49. Ms. Waltz expressed frustration and complained to human resources that Ms. Zamd's request to meet outside was "inappropriate."

50. Later that afternoon, on May 22, 2013, just two days after granting her accommodation, Vertex terminated Ms. Zamd's employment. The ostensible reason for her dismissal was her failure to cooperate with Vertex, not trusting Vertex, and alleged complaints about her performance. These complaints had not been communicated to Ms. Zamd prior to giving her notice of her termination.

51. Vertex never actually implemented a reasonable accommodation for Ms. Zamd's disability.

52. As a result of Vertex's treatment of her, Ms. Zamd has suffered damages, including but not limited to lost wages and emotional distress.

## Claims

### COUNT I
*Discrimination Based on Disability and Failure to Accommodate in Violation of 42 U.S.C. §12112*

The plaintiff repeats and reiterates the allegations of the preceding paragraphs 1 through 52, inclusive, and incorporates them herein by reference.

53. Ms. Zamd was, at all times relevant to this action, a person with a disability, as defined by law.

54. Ms. Zamd was, at all times relevant to this action, able to perform the essential functions of her position with or without accommodation.

55. Vertex had a duty to provide Ms. Zamd with reasonable accommodation, which it failed and refused to do.

56. Vertex had a duty to refrain from discriminating against Ms. Zamd on account of her disability.

57. Notwithstanding its duty, Vertex discriminated against Ms. Zamd on account of her disability by, *inter alia,* treating her differently than non-handicapped employees, by removing her job duties, by denying her reasonable accommodation, and by terminating her employment, as more particularly described above.

58. Vertex violated 42 U.S.C. §12112, by refusing to accommodate Ms. Zamd, and by discriminating against her, as more particularly set forth above.

59. Vertex knew, or should have known, that its conduct violated 42 U.S.C. §12101, *et seq*.

60. Vertex's violation of law has damaged Ms. Zamd.

61. In depriving Ms. Zamd of her rights, Vertex acted knowingly and intentionally, with malice and/or with reckless indifference to Ms. Zamd's rights.

62. Vertex is liable to Ms. Zamd for the violations of law set forth above.

COUNT II
*Retaliation in Violation of 42 U.S.C. §12112*

The plaintiff repeats and reiterates the allegations of the preceding paragraphs 1

through 62, inclusive, and incorporates them herein by reference.

63. Vertex had a duty to refrain from retaliating against Ms. Zamd for having asserted her right to be free from violations of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq*.

64. Notwithstanding its duty, Vertex retaliated against Ms. Zamd for having asserted her right to be free from violations of 42 U.S.C. §12101, *et seq.,* by, *inter alia*, treating her differently than employees who had not sought accommodation, by removing her job duties, by unreasonably delaying her reasonable accommodation determination, by permitting employees to harass and bully her for seeking accommodation, by never implementing its proposed reasonable accommodation, and by terminating her employment, as more particularly described above.

65. The retaliation more particularly described above violated 42 U.S.C. §12112.

66. Vertex knew, or should have known, that its conduct more particularly described above violated 42 U.S.C. §12101, *et seq*.

67. The retaliation more particularly described above has damaged the plaintiff.

68. In retaliating against Ms. Zamd, Vertex acted knowingly and intentionally, with malice and/or with reckless indifference to Ms. Zamd's rights.

69. Vertex is liable to Ms. Zamd for the violations of law set forth above.

WHEREFORE, Irene Zamd, the plaintiff, prays the court to:

a) Award her damages for the violations of law set forth above, according to law.

b) Award her punitive damages, according to law.

c) Award her interest, according to law.

d) Award her her reasonable costs and attorneys' fees for the bringing and arguing of this matter.

e) Grant such additional relief as the court deems reasonable and proper.

DEMAND FOR JURY TRIAL

The plaintiff demands a jury trial on all applicable issues.

June 30, 2017

Irene Zamd
Plaintiff
by her attorneys,

*/s/ Beth R. Myers*

Jonathan J. Margolis, BBO # 319980
jmargolis@theemploymentlawyers.com
Beth R. Myers, BBO # 676043
beth@theemploymentlawyers.com
Powers, Jodoin, Margolis & Mantell LLP
111 Devonshire Street, Suite 400
Boston, MA 02109
(617) 742-7010

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s), filed through the ECF system will be served electronically upon all registered participants as identified in the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered parties this 30th day of June 2017.

*/s/ Beth R. Myers*
Beth R. Myers