**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

## - DISMISSAL and NOTIFICATION of RIGHTS - mailed 08/04/16

**To:** Irene D. Zamd
88 Paquin Drive
Marlborough, MA 01752

**Case:** Irene Zamd v. Vertex Pharmaceuticals, Inc.
**MCAD Docket Number:** 14BEM00335
**EEOC Number:** 16C-2014-00895
**Investigator:** Stephanie M. Butler

Your complaint has been dismissed for the following reasons:

[ ] The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ] Respondent employs less than the required number of employees.

[ ] Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ] You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ] The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ] The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[X] The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ] Other (briefly state)

### - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. **Attention: Nancy To.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Charlotte Golar Richie
Charlotte Golar Richie
Investigating Commissioner

August 3, 2016
Date

Cc:

Atty. James F. Norton
James F. Norton Law
117 Congress Street
Braintree, MA 02184

Mark D. Pomfret, Esq.
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

Vertex Pharmaceuticals, Inc
Director of Human Resources
50 Northern Avenue
Boston, MA 02210

# INVESTIGATIVE DISPOSITION

| | |
|---|---|
| Case Name: | Irene Zamd v. Vertex Pharmaceuticals, Inc. |
| MCAD Docket No.: | 14BEM00335 |
| EEOC Docket No.: | 16C-2014-00895 |
| No. of Employees: | 25+ |
| Investigator: | Stephanie M. Butler, Legal Intern |
| Recommendation: | **Lack of Probable Cause** |

---

## Introduction

On January 24, 2014, Complainant Irene Zamd filed this action against Respondent Vertex Pharmaceuticals, Inc., alleging that they discriminated against her on the basis of disability (Multiple Chemical Sensitivity), and in retaliation for engaging in protected activity, in violation of M.G.L. c. 151B §4(16) & (4), and the ADA.

## Complainant's Allegations

Complainant alleges as follows:

Complainant suffers from a condition called Multiple Chemical Sensitivity, an extreme sensitivity to fragrances that renders Complainant unable to work in the presence of such scents. On June 14, 2010, Complainant was hired as Lead Quality Assurance Auditor/Specialist in the Quality Compliance Management Good Clinical Practice Division ("QCMGCP Division") of Vertex Pharmaceuticals, Inc. Complainant was employed in this capacity until she was terminated on May 22, 2013. Complainant reported her condition to Respondent and her co-workers upon employment. Complainant performed her duties diligently and received among the highest performance ratings. Complainant's most recent performance rating from December of 2012 shows the highest performance rating possible. Complainant received no criticism of her job performance from this point until her termination.

Towards the end of 2012, the workforce in Complainant's work area in Respondent's Cambridge location changed. As a consequence, Complainant was exposed to fragrances that triggered her symptoms, and prevented her from performing her duties. Complainant sometimes travelled in her capacity at Vertex, and would ask that the locations that she visited, airlines that she used, etc., not use fragrances to which she was sensitive when she visited. Complainant had never had a problem receiving such accommodations while travelling, and as such was still capable of performing duties in other locations.

In February, 2013, Complainant initiated efforts to get an accommodation to her sensitivity. Complainant spoke with Robert Castellucci, Vice President of Quality, and told him about her condition. Complainant requested that she be permitted to work from home for at least part of the week. Complainant's request was denied despite the fact that other employees within her department had been allowed to work from home in the past, and one current employee was allowed to work from her home in Canada for two consecutive weeks out of four. Mr. Castellucci offered to send out a general e-mail informing the employees of Complainant's condition, but he did not.

Complainant then spoke with Deborah Waltz, Senior Director of QCMGCP, who referred Complainant to Human Resources ("HR"). HR representatives requested that Complainant obtain a statement from her physician documenting her condition, which Complainant provided on March 13, 2013. Dr. Michele Goh recommended that Complainant not work in areas where scented products and essential oils were prevalent, and that one accommodation would be permitting Complainant to work from home for part of the week.

On April 1, 2013, Ms. Waltz informed Complainant that her request to work from home had been denied, and that because Vertex could not control external work areas, Complainant would no longer be permitted to perform audits off-site. As a result, Complainant's upcoming off-site audit was transferred to a different employee. Ms. Waltz also suggested that Complainant may want to transfer to a different department. Complainant complained to HR about this outcome and requested a meeting to discuss the matter. Ms. Waltz's statement that the accommodation had been denied was false as on May 9, 2013, HR asked Complainant to have her doctor provide additional information regarding her condition. Complainant provided this information on May 13.

In April and May 2013, Ms. Waltz sent e-mails to HR representatives criticizing Complainant's behavior and performance even though Ms. Waltz had not discussed these criticisms with Complainant. Complainant alleges that these statements were false. On or about May 20, 2013, Complainant met with Ms. Amanda Tramantozzi, an HR representative, and Ms. Jane Martiny, Vertex Senior Benefits Specialist. At this meeting, Complainant was informed that her request to work from home had been approved, and that she would likely be provided with her own private office in the Cambridge location. Complainant was also informed that she would be able to travel for work as she had in the past.

On May 22, 2013, Complainant received a formal letter confirming that her request for reasonable accommodation had been approved. Also on May 22, Complainant was called into a meeting with Ms. Emily Kuperstein, HR Director, and Mr. Castellucci, where she was terminated for failure to cooperate with Vertex, not trusting Vertex, and because of complaints from internal clients about her performance. This was the first time that Complainant was made aware of these deficiencies in her performance.

Respondent's Position

Respondent responds as follows:

Respondent Vertex Pharmaceuticals, Inc. is a biotechnology company engaged in the discovery, development, and commercialization of medicines that treat various diseases, such as Hepatitis-C and cancer. Complainant's position as Lead Quality Assurance Auditor/Specialist required collaboration and constructive communication between and among its employees, which made it critical that QCMGCP Division employees be present at the office as much as possible.

Complainant reported her condition shortly after beginning her employment, but at that time did not request a specific accommodation. Respondent's HR team advised Complainant to work with her supervisor or HR if she needed an accommodation. Respondent also asked Complainant's co-workers to refrain from wearing or using products containing fragrances that might adversely affect Complainant.

Between September 2010 and early 2013, Complainant did not request an accommodation. However, during this time Respondent's management and HR department received numerous complaints about Complainant making uncomfortable demands of fellow employees, contractors, and audit subjects about fragrances and odors. For example, Complainant aggressively confronted co-workers who used such products and told them these products would give them cancer.

Complainant had multiple performance deficiencies throughout her employment, which were more apparent in her last five months at Vertex. In April and May, 2012, shortly before Complainant went on FMLA leave due to stress, she was very rude and unprofessional in her interactions with her then supervisor, Val Michailovski. Mr. Michailovski filed a formal complaint after Complainant insubordinately screamed at Mr. Michailovski during a meeting. The HR team counseled Complainant about her poor behavior, including Complainant's manner of communicating with her supervisor. The following day, Complainant disregarded said counseling and e-mailed Mr. Michailovski, insisting that all of their future correspondence be summarized in writing, demonstrating contempt for and distrust of the HR team and her immediate supervisor.

Respondent provided Complainant with leave and pay in excess of the FMLA requirements by allowing Complainant to be paid for the entire 12 weeks of her leave, and in addition by permitting her to take a week of vacation after her leave ran out. Further, upon Complainant's return to work in August of 2012, Respondent accommodated Complainant by allowing her to leave early each day for an extended period in order to continue receiving medical treatment.

Around the time when Complainant returned to work from her leave, Respondent selected Deborah Waltz as the Senior Director of QCMGCP Division due to heavy attrition within

the group. For a period of time, Complainant worked in a limited, non-auditing capacity assisting Ms. Waltz in administrative and hiring functions, which accounts for Complainant's positive performance evaluation in December of 2012. There was an influx of new personnel, so Complainant was assigned fewer audits, which seemed to make Complainant resentful of Ms. Waltz and Complainant's co-workers. Since Ms. Waltz's efforts were focused on the auditing process, the process was under closer scrutiny. This made Complainant's performance deficiencies more apparent.

By 2013, Complainant would not take meeting requests from her colleagues and would not respond appropriately to their inquiries, and Complainant sent out group e-mails unnecessarily insulting her colleagues. Thereafter, Ms. Waltz spoke with and e-mailed Complainant numerous times to tell her that she ought to improve her interpersonal skills. Complainant also failed to timely inform Ms. Waltz when she wanted to work from home. Complainant often times would request to work from home late at night the night before or early on the same morning that she wanted to stay home. Complainant took two to three times as long to complete her work as other employees, and routinely made so many errors that her assignments would have to be redone by a junior member of QCMGCP. Complainant also admitted to a colleague that the junior members were better performers and that Complainant made basic mistakes.

On March 8, 2013, Complainant rejected a final report from Falcon Consulting Group ("Falcon"), insisting that Falcon make minor edits. Falcon forwarded these comments to Amanda Siedlar and Judy Atkins in the Compliance Resources Department of Vertex because Complainant had made inappropriate and potentially offensive comments on the report. One such comment was: "are auditors just writing anything so it looks good but have no substantiation?" Further, Complainant often made these types of requests, which delayed the reports and cost Falcon money to reopen and refinalize. Several other vendors made similar complaints about Complainant.

On or about April 1, 2013, Ms. Waltz advised Complainant that Respondent would provide her with a separate office space, but Complainant said that would not help her with her "horrible commute." Complainant then demanded that she be allowed to work from home every day of the week instead of the three days that she had initially requested. Ms. Waltz suggested that this might not be possible because of the importance that the auditor be present at the office or the auditing site, and suggested other non-auditing functions that Complainant could do as accommodations, which Complainant rejected.

On April 22, 2013, Complainant sent an e-mail to Ms. Waltz implying that her team was intentionally excluding her from a meeting by proceeding when she was ill. Complainant's team and Ms. Waltz both expressed that they were aware that Complainant was ill, but that they had to proceed with the meeting as it had been rescheduled twice. Further, Complainant had never responded to the team's e-mails, even though she was invited to the meeting each time. Complainant did not advise the team that she would be

out that day until that morning. Also, the team sent Complainant an e-mail explicitly stating that they were awaiting her direction.

During the week of April 29, 2013, Complainant's HR representative requested more detailed documentation from Complainant's physician, including whether Complainant could travel, and if so how often and what precautions Respondent should take.

On May 15, 2013, Complainant was working from home and tried to call into a meeting. Complainant had not informed her team that she would have been calling in to the meeting until she sent an e-mail four minutes prior to the start of the meeting. Her colleagues did not receive this e-mail prior to the start of the meeting. Nonetheless, Respondent felt that Complainant was aggressive and accusatory in her interactions; Complainant alleged that the meeting room was moved and she was not informed. The team stated that the location was not changed, and Complainant would have been provided with correct information for calling in if she had provided her colleagues with adequate notice.

Also on May 15, 2013, Complainant's physician provided documentation which stated that starting on a schedule where Complainant worked three days from home, and two days in the office would be an appropriate accommodation, and that Complainant could then request modifications if necessary. Complainant requested additional modifications, such as that Complainant determine which days she was to work from home on a week to week basis. Respondent was willing to grant Complainant's additional requests. Ms. Waltz attempted to meet with Complainant on May 21, 2013 to discuss which days Complainant would work from home, but Complainant was not in the office that day, and did not notify Respondent that she would be out.

When Ms. Waltz attempted to reschedule the meeting for May 22, 2013, Complainant said that she could not meet with Ms. Waltz because Ms. Waltz was wearing an offensive scent which gave Complainant a migraine. Complainant further stated "[s]o that we can continue with our scheduled meeting, I would appreciate meeting outside in the terrace/patio outside the cafeteria. I would propose you washing off, but once the person has applied these products, it stays on the clothes as well, thus it would not work." Ms. Waltz was not wearing any scented products that day. Ms. Waltz found this comment to be offensive, and an example of Complainant's distrust of her supervisor and her ongoing issues with interpersonal relations. Ms. Waltz observed Complainant in the coffee area laughing with another employee shortly thereafter, and Complainant was not exhibiting any sign of migraine, even when Ms. Waltz stood near her.

Complainant was terminated later that day because Respondent had determined that Complainant was unable to perform the essential functions of her job because she lacked the necessary disposition, professionalism, and interpersonal skills, and because her actions were adversely affecting the other employees in the Division.

Complainant's request for reasonable accommodation was never denied, although it was delayed pending the completion of her ADA paperwork. Complainant's request for reasonable accommodation was approved before she was terminated. Complainant resisted providing medical documentation to support her accommodation request. Complainant was also never told that she would not be allowed to travel.

Summary of Investigation and Analysis

*Disability*

A disabled person is a person who has an impairment that substantially limits one or more major life activities, a record of having such an impairment, or is regarded as having such an impairment. In order to be a "qualified" individual with a disability, Complainant must be capable of performing the essential functions of the job with or without and accommodation.

*I. Failure to Provide Reasonable Accommodation*

To establish a prima facie case that Respondent denied Complainant a reasonable accommodation, Complainant must first establish that she is a qualified individual with a disability and that she requested a reasonable accommodation for her disability. Complainant must further establish that Respondent denied the accommodation or failed to engage in an interactive dialogue regarding the accommodation. If Complainant establishes the prima facie case, Respondent may show that Complainant is not capable of performing the essential functions of the job, or that the provision of accommodation is not reasonable as it would impose an undue hardship on Respondent's business.

Complainant is an individual with a disability and she requested the following accommodations for her disability : to work from home for part of the week and a leave of absence for stress. Regarding the leave of absence, Respondent provided a paid leave of absence to Complainant in 2012 and permitted her to take a week vacation after her leave ran out and allowed her to leave early each day for an extended period in order to get medical treatment. Regarding the second request for an accommodation of working from home 3 days a week, Respondent granted this accommodation but Complainant then asked that she work from home 5 days a week. Investigation further reveals that Respondent would provide a separate office space. Although Complainant alleges that Respondent delayed providing her with reasonable accommodations, investigation reveals that Complainant was uncooperative and failed to attend meetings with HR and management regarding her accommodations.

Further, Respondent has provided a number of correspondences between Complainant and Respondent, which show that Respondent offered Complainant numerous accommodations, including the accommodation that Complainant requested. Respondent also informally accommodated Complainant throughout her employment by allowing her

to work from home when necessary without taking disciplinary action, as evidenced by e-mail correspondences. Furthermore, Complainant continually impeded the interactive dialogue by being argumentative and resisting filling out the ADA paperwork. As such, Respondent did not either deny Complainant a reasonable accommodation, nor did Respondent fail to engage in an interactive dialogue.

*II. Termination*

To establish a prima facie case of discriminatory termination based on disability, Complainant must first establish that she is an individual with a disability within the meaning of the statute, she is qualified to perform the essential functions of the job with or without reasonable accommodation, she was terminated, and the circumstances of the termination give rise to an inference of disability discrimination. If complainant establishes the prima facie case, Respondent may show that legitimate, nondiscriminatory reasons exist for the termination. If Respondent succeeds in offering such reasons, Complainant must then show that Respondent's reasons are pretextual.

In this case, Complainant has established that she is a qualified individual with a disability, and she was terminated. However, the circumstances of Complainant's termination do not give rise to an inference that her termination was linked to disability discrimination.

Even if Complainant could establish a prima facie case of discriminatory termination, Respondent has provided legitimate, nondiscriminatory reasons for Complainant's termination: insubordination, a lack of professionalism, interpersonal skills and an inability to get along with her co-workers. Respondent provided evidence in the form of emails from Complainant's co-workers, management, and an outside party that Respondent did business with; this evidence supports Respondent's position that Complainant's poor interpersonal skills were interfering with business. Respondent provides sufficient evidence to establish that Complainant was terminated because Respondent received consistent negative feedback about Complainant's performance and behavior from her own team, Human Resources, clients, and other external parties, all of whom stated that no matter how they attempted to engage or accommodate Complainant, she was dissatisfied, mistrustful, and argumentative. Respondent further provides evidence in the form of Complainant's e-mail correspondence with Ms. Waltz, which is sufficient to establish that Complainant also refused to cooperate with management regarding the schedule for her accommodation. As Complainant does not provide sufficient evidence to establish that Respondent's reasons are pretextual, Complainant does not establish a prima facie case of discriminatory termination based on her disability.

*Retaliation*

In order to establish a prima facie case for retaliation, Complainant must show that: (1) she engaged in a protected activity; (2) Respondent was aware that she had engaged in protected activity; (3) Respondent subjected her to an adverse employment action; and (4)

a causal connection exists between the protected activity and the adverse employment action. If Complainant establishes the prima facie case, Respondent may show that legitimate, nondiscriminatory reasons exist for the adverse action. If Respondent succeeds in offering such reasons, Complainant must then show that Respondent's reasons are pretextual.

Complainant engaged in a protected activity by seeking a reasonable accommodation for her disability, and she was terminated within days of being granted an accommodation.

Even if Complainant were to demonstrate a prima facie case of retaliation, Respondent has provided evidence in the form of e-mail correspondences, which are sufficient to establish the existence of legitimate, non-discriminatory reasons for her termination: she made rude and unprofessional statements to management, co-workers, and vendors, which disrupted the workplace and threatened Respondent's relationships with their vendors.
As discussed above, investigation reveals that Respondent repeatedly attempted to accommodate Complainant, and when Respondent provided Complainant with the specific reasonable accommodation that her physician had indicated and Complainant had requested, Complainant requested a more substantial accommodation without going through the trial period proposed by Respondent. Further, Complainant failed to attend a meeting with Respondent to work out a schedule for her accommodation on May 22, 2013, even though this meeting had been rescheduled to accommodate Complainant's needs.

Conclusion

A finding of Lack of Probable Cause is recommended for Complainant's claims of retaliation and discrimination based on disability against Vertex Pharmaceuticals, Inc.

Stephanie M. Butler
Legal Intern

Karen Erickson
Enforcement Advisor

Disposition

Pursuant to section 5 of M.G.L. c. 151B of the Massachusetts General Laws, and in conformity with the foregoing findings, I have this day determined that a **Lack of Probable Cause** is being rendered on this case. Complainant will be afforded the opportunity to appeal this decision.

Charlotte Golar Richie
Investigating Commissioner

August 3, 2016
Date